Seton Hall University School of Law
Center for Social Justice
Andrew M. Darcy (016852010)
833 McCarter Highway
Newark, NJ 07102
andrew.darcy@shu.edu
(973) 642-8231

Gibbons P.C.
Lawrence S. Lustberg (023131983)
Madhulika Murali*
One Gateway Center
Newark, NJ 07102
llustberg@gibbonslaw.com
(973) 596-4500

*Attorneys for Plaintiffs and the Class*
*\*Motion for pro hac vice admission forthcoming*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GERARDO ARIAS, MIGUEL ASIG, LUIS BLANCO, SULMA PINSON, ROOSEVELT RIASCOS, JUAN ROSALES, YOLANDA TORRALBA, NELLY TORRES, and ENEIDA VASQUEZ, on behalf of themselves and all others similarly situated, | Civil Action No.: |
| | **FIRST CLASS ACTION COMPLAINT AND JURY DEMAND** |
| *Plaintiffs,* | |
| vs. | |
| CITY OF PLAINFIELD, New Jersey; LETICIA VELEZ, individually and in her official capacity as Director of the Division of Inspections of the City of Plainfield; CYCLONE INVESTMENT GROUP, LLC; ARLINGTON 33 LLC; CYCLONE KENSINGTON 18 LLC; CYCLONE WEST 84 LLC; JANE DOE/JOHN DOE MANAGERS 1-99; and JANE DOE/JOHN DOE MANAGEMENT COMPANIES 1-99, | |
| *Defendants.* | |

Plaintiffs[1] Gerardo Arias, Miguel Asig, Luis Blanco, Sulma Pinson, Roosevelt Riascos, Juan Rosales, Yolanda Torralba, Nelly Torres, and Eneida Vasquez (each, a "Plaintiff" and, collectively, "Plaintiffs"), by way of class action complaint on behalf of themselves and all others similarly situated (the "Class"), against

- the City of Plainfield, New Jersey (the "City") and Leticia Velez, in her individual and official capacities (each, a "Defendant" and, collectively, the "Municipal Defendants"); and

- Cyclone Investment Group, LLC; Arlington 33 LLC; Cyclone Kensington 18 LLC; Cyclone West 84 LLC; Jane Doe/John Doe Managers 1-99; and Jane Doe/John Doe Management Companies 1-99 (collectively, the "Landlord Defendants"),

based upon their knowledge, information, and belief, formed after an inquiry under the circumstances, allege as follows:

---

[1] In accordance with Local Civil Rule 10.1, Plaintiffs state that they and all other members of the proposed Class (defined below) can be reached at the addresses of their undersigned counsel.  Defendants' business addresses are as follows: City of Plainfield, 515 Watchung Ave., Plainfield, NJ, 07060; Leticia Velez, 515 Watchung Ave., Plainfield, NJ, 07060; Cyclone Investment Group, LLC, 38 S. Central Ave., Valley Stream, NY, 11580 and/or 8170 McCormick Blvd., Suite 123, Skokie, IL, 60076; Arlington 33 LLC, 311 Boulevard of the Americas, Suite 206, Lakewood, NJ, 08701; Cyclone Kensington 18 LLC, 38 S. Central Ave., Valley Stream, NY, 11580; Cyclone West 84 LLC, 1350 E. 13th St., Brooklyn, NY, 11230.

## INTRODUCTION

1.      This case addresses the circumstances under which approximately three hundred people, including children, pregnant women, and elderly people, were, overnight, forcibly and permanently displaced from their homes by the Municipal Defendants.

2.      Specifically, over the course of months in the spring and summer of 2023, the Municipal Defendants instituted and executed a policy and/or custom of closing[2] the buildings in which Plaintiffs resided—six of them on three different lots—and permanently displacing the approximately three hundred members of the Class.

3.      This forcible and permanent displacement was effected by the Municipal Defendants in a matter of just a few hours following the first and only notice they had given regarding the closures.

4.      The Municipal Defendants closed the buildings purportedly because of the horrific conditions that Plaintiffs were forced to endure in their homes.  These conditions included, but were not limited to, infestations of rats, mice, and insects;

---

[2] The Municipal Defendants have incorrectly labeled their actions "condemnation," which is a legal term defined by state law.  N.J.S.A. 20:3-2(a).  Because Municipal Defendants' actions were not official condemnations and not authorized by state or local law, this Complaint refers to the actions as "shutting" or "closing."

persistent leaks; uncapped sewer pipes that leaked fecal matter; broken toilets; excessive and hazardous mold; and inadequate heat and hot water.

5.      Plaintiffs complained to Landlord Defendants numerous times about these conditions, but Landlord Defendants refused to address them.

6.      Instead of exercising their governmental powers to require that these conditions be fixed so that Plaintiffs would be living in safe and habitable homes, the Municipal Defendants chose to leave Plaintiffs with no homes at all.

7.      As a result, Plaintiffs experienced homelessness for months.  Members of the Class (as defined below) were variously forced to sleep outside on blankets, on grass, in cars, and in friends' and families' basements.  In one case, a mother who had given birth just three days prior was forced to sleep in a car while caring for her newborn child.

8.      Plaintiffs have not been allowed to return to live in the homes they had lived in for years.

9.      Plaintiffs and the Class bring this case seeking redress for the severe financial, emotional, and psychological harm they have endured as a result of the conditions in their former homes, as well as the manner in which those homes were forcibly and permanently taken from them.

## PARTIES

10.     Plaintiff Gerardo Arias is a former resident of 705 Kensington Avenue, Plainfield, New Jersey, 07060.

11.     Plaintiff Miguel Asig is a former resident of 717 Arlington Avenue, Plainfield, New Jersey, 07060.

12.     Plaintiff Luis Blanco is a former resident of 501 West 7th Street, Plainfield, New Jersey, 07060.

13.     Plaintiff Sulma Pinson is a former resident of 705 Kensington Avenue, Plainfield, New Jersey, 07060.

14.     Plaintiff Roosevelt Riascos is a former resident of 715 Arlington Avenue, Plainfield, New Jersey, 07060.

15.     Plaintiff Juan Rosales is a former resident of 701 Kensington Avenue, Plainfield, New Jersey, 07060.

16.     Plaintiff Yolanda Torralba is a former resident of 501 West 7th Street, Plainfield, New Jersey, 07060.

17.     Plaintiff Nelly Torres is a former resident of 709 Kensington Avenue, Plainfield, New Jersey, 07060.

18.     Plaintiff Eneida Vasquez is a former resident of 701 Kensington Avenue, Plainfield, New Jersey, 07060.

19.     Defendant City of Plainfield ("the City") is and was a government entity of the State of New Jersey with a business address of 515 Watchung Avenue, Plainfield, New Jersey, 07060.

20.     Defendant Leticia Velez is, and at all relevant times was, the Director of the City's Division of Inspections.  Defendant Velez is employed by the City and has a business address of 515 Watchung Avenue, Plainfield, New Jersey, 07060. Defendant Velez is sued in her official and individual capacities.

21.     Defendant Cyclone Investment Group, LLC ("Cyclone") is a national real estate acquisition and asset management firm with a portfolio of roughly $1 billion under management.  Cyclone owns and/or manages, directly or indirectly, eight thousand residential units across the country.

22.     Cyclone's business addresses are 38 S. Central Avenue, Valley Stream, New York, 11580 and/or 8170 McCormick Blvd., Suite 123, Skokie, Illinois, 60076.

23.     Agents and/or principals of Cyclone created and/or managed limited liability corporations to purchase and operate at least three properties in Plainfield.

24.     Defendant Arlington 33 LLC is an affiliate or subsidiary of Cyclone, with which it shared common principals and/or agents, and which at all relevant times owned 715–725 Arlington Avenue in Plainfield.  Arlington 33 LLC's business address is 311 Boulevard of the Americas, Suite 206, Lakewood, New Jersey, 08701.

25.     Defendant Cyclone Kensington 18 LLC is an affiliate or subsidiary of Cyclone, with which it shared common principals and/or agents, and which at all relevant times owned 701–711 Kensington Avenue in Plainfield.  Kensington 18 LLC's business address is 38 S. Central Avenue, Valley Stream, New York, 11580.

26.     Defendant Cyclone West 84 LLC is an affiliate or subsidiary of Cyclone, with which it shared common principals and/or agents, and which at all relevant times owned 501–515 West 7th Street in Plainfield.  Cyclone West 84 LLC's address is 1350 E. 13th Street, Brooklyn, New York, 11230.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs and the Class seek redress for claims that arise under the Constitution and laws of the United States.

28.     This Court has supplemental jurisdiction over Plaintiffs' and the Class's state law claims pursuant to 28 U.S.C. § 1367 because those claims share a common nucleus of operative fact with Plaintiffs' and the Class's federal law claims.

29.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to Plaintiffs' and the Class's claims occurred within this district.

30.     The proper vicinage is Newark because the events and omissions giving rise to the claims occurred in Union County, New Jersey.

## FACTUAL ALLEGATIONS

### A. Cyclone Investment Group

31.    Plainfield is a New Jersey city that is approximately thirty miles west of New York City.

32.    Cyclone Investment Group "is a real estate acquisition and asset management firm."[3]

33.    As Cyclone states on its website, its "target acquisition is stabilized multi-family properties with strong in-place cash flow."  Not only does Cyclone want to acquire buildings that have "strong in-place cash flow," it also "looks to improve operational efficiency in the form of controllable expense reduction," which "allows Cyclone to quickly begin distributing cash flow to [its] investors."[4]

34.    In its promotional material, Cyclone touted that its business strategy would allow it to deliver "superior returns to investors."[5]

*Kensington*

35.    701–711 Kensington Avenue ("Kensington") comprises three separate buildings numbered 701, 705, and 709, on a single lot in Plainfield.

---

[3] Cyclone Investment Group, https://www.cycloneinvestmentgroup.com/ (last visited April 24, 2025).
[4] Cyclone Investment Group, *About,*
https://www.cycloneinvestmentgroup.com/about (last visited April 24, 2025).
[5] *Id.*

36.     Each of the Kensington buildings consists of three stories and six apartments, totaling eighteen apartments on the property.

37.     Defendant Cyclone Kensington 18 LLC purchased the Kensington buildings in or around November 2020.

38.     Based on publicly available information, it is evident that Cyclone Kensington 18 LLC is either a subsidiary of Cyclone or a related company without any unique employees or independent business functions.

39.     For years before the closures, the conditions at the Kensington buildings were unhealthy and dangerous.

40.     The New Jersey Department of Community Affairs ("NJDCA") conducts routine inspections of multifamily properties in New Jersey, known as "cyclical inspections."

41.     NJDCA inspected the Kensington buildings several times before Cyclone Kensington 18 LLC's purchase.

42.     NJDCA previously determined that the Kensington buildings had hundreds of conditions that violated New Jersey Administrative Code ("NJAC") regulations regarding the minimum safety and maintenance requirements for multifamily properties in New Jersey.

43.     In 2017, NJDCA inspected Kensington and issued sixty-four violations of the New Jersey Administrative Code ("NJAC violations").  The NJAC violations

included, but were not limited to, drainage system issues; faulty lighting in common areas; issues regarding the buildings' exteriors; potholes in the parking lots; and kitchen repairs.  By 2019, however, the prior owner of the buildings had cured all the violations.

44.    After Cyclone Kensington 18 LLC purchased the property, Plaintiffs and the Class raised concerns about the condition of the property with agents of the Landlord Defendants.

45.    The Landlord Defendants did little or nothing to address the concerns raised by residents.

46.    The City conducts inspections of residential properties throughout Plainfield in order to "ensure the health, safety, and well-being of all the residents of the City of Plainfield" through enforcement of the Plainfield Property Maintenance Code ("PPMC").[6]

47.    The City inspected Kensington in June 2023, at which point it issued hundreds of notices of violations of the PPMC ("PPMC violations").  The PPMC violations at Kensington included, but were not limited to, defective plumbing; uncapped sewer pipes; damaged or missing radiators; excessive and hazardous mold; damaged and leaking roofs; and unsecure electrical outlets.

---

[6] Plainfield N.J. Gov., *Inspections Division & Code Enforcement*, https://www.plainfieldnj.gov/residents/household/code_enforcement_and_inspections_division/index.php (last visited April 24, 2025).

*Arlington*

48.    715–725 Arlington Avenue ("Arlington") comprises two buildings on a single lot in Plainfield.

49.    The two Arlington buildings consist of a total of thirty-two apartments.

50.    Defendant Arlington 33 LLC purchased the Arlington buildings in or around February 2019.

51.    Based on publicly available information, it is evident that Arlington 33 LLC is either a subsidiary of Cyclone or a related company without any unique employees or independent business functions.

52.    For years, the conditions at the Arlington buildings were unhealthy and dangerous.

53.    NJDCA's most recent cyclical inspection before Arlington 33 LLC's purchase was in 2017, at which point NJDCA issued ninety NJAC violations. The NJAC violations included, but were not limited to, issues regarding the buildings' exteriors; potholes in the parking lot; kitchen repairs; doors that did not close properly or were otherwise defective; blocked fire escapes; and the need for bathroom repairs.

54.    The Landlord Defendants were on notice of the unhealthy and dangerous conditions at the Arlington buildings at the time of the purchase.

55.    After they purchased Arlington, the Landlord Defendants did little or nothing to address those conditions.

56.    In April 2023, NJDCA completed a scheduled cyclical inspection and issued two hundred thirty NJAC violations—more than twice the amount of violations issued before Cyclone purchased the buildings.

57.    The City inspected Arlington in August 2023, at which point it issued thirty-seven PPMC violations.  The PPMC violations at Arlington included, but were not limited to, defective plumbing; uncapped sewer pipes; damaged or missing radiators; excessive and hazardous mold; damaged and leaking roofs; and unsecure electrical outlets.

*501 West 7th Street*

58.    501 West 7th Street ("501 West 7th" and, along with Kensington and Arlington, collectively, the "Buildings") is a standalone building that is adjacent to 515 West 7th Street ("515 West 7th").

59.    501 West 7th consists of forty-four residential dwellings and 515 West 7th consists of forty-three.

60.    Cyclone West 84 LLC purchased 501 West 7th in or around October 2021.

61.     Based on publicly available information, it is evident that Cyclone West 84 LLC is either a subsidiary of Cyclone or a related company without any unique employees or independent business functions.

62.     For years, the conditions at 501 West 7th were unhealthy and dangerous.

63.     NJDCA's most recent cyclical inspection of 505 West 7th and 515 West 7th prior to Cyclone West 84 LLC's purchase was in May 2021, at which point NJDCA issued four hundred forty-six NJAC violations.  While that total includes NJAC violations for 515 West 7th, approximately half of the NJAC violations were unique to 501 West 7th.  The NJAC violations included, but were not limited to, issues regarding the building's exteriors; the need for bathroom repairs; uneven ceilings; insufficient electrical outlets in kitchens; and the need for new paint.

64.     The Landlord Defendants were on notice of the unhealthy and dangerous conditions of the 501 West 7th at the time of the purchase.

65.     After they purchased 501 West 7th, the Landlord Defendants did little or nothing to address those conditions.

66.     NJDCA re-inspected 501 West 7th and 515 West 7th in April 2024, at which point it issued three hundred ninety-eight NJAC violations.

67.     The City inspected 501 West 7th in August 2023, at which point it issued at least twenty PPMC violations.  The PPMC violations at 501 West 7th

13

included, but were not limited to, defective plumbing; uncapped sewer pipes; damaged or missing radiators; excessive and hazardous mold; damaged and leaking roofs; and unsecure electrical outlets.

## B. The Municipal Defendants Execute a Plan to Close Each of Cyclone's Buildings

68.    The Municipal Defendants were aware or should have been aware of the issues in the Buildings prior to the Landlord Defendants' purchases.

69.    Yet the Municipal Defendants failed to take any responsive actions requiring the Landlord Defendants to remediate the conditions other than the mass, forcible displacement described below.

70.    Indeed, until 2022, it appears that the Municipal Defendants took no action to enforce basic health and safety laws that apply to the Buildings.

71.    Upon information and belief, on January 6, 2022, City officials temporarily shut one of the Arlington buildings, purportedly due to lack of heat.

72.    At some point shortly after that closure, the residents of the building were allowed to move back in and resume living there.

73.    On March 31, 2022, and again on April 13, 2022, the City shut both of the Arlington buildings, finding them "unfit for human habitation" and structurally unsound.

74.    In both instances, the residents of the buildings were allowed to reenter the buildings shortly after the closures and resume living there.

75.    On March 31, 2023, the City re-inspected Arlington and issued thirty-seven PPMC violations.

76.    Then, beginning in May 2023 and continuing through August 2023, the City began a process whereby it would close each of the Landlord Defendants' properties in the City.

77.    Upon information and belief, the Municipal Defendants began doing so in order to take the Landlord Defendants' property through the exercise of eminent domain powers and then to redevelop the properties.

78.    The specific timeline of the Municipal Defendants' actions is set forth in the following paragraphs.

79.    In late April 2023, the City's Fire Department was called to one of the Kensington buildings at 705 Kensington Avenue because of a leak from a pipe that allegedly caused a flood.

80.    Shortly thereafter, on May 1, 2023, the Municipal Defendants posted a notice at or around the building which indicated that the building would be closed within twenty-four hours.  A copy of the notice placed at 705 Kensington Avenue is attached as **Exhibit A**.

81.    The purported "Notice of Condemnation" was from the City's Division of Inspections.  It was signed by Defendant Leticia Velez and stated: "THIS BUILDING IS DECLARED UNFIT FOR HUMAN HABITATION; THE USE OR

OCCUPANCY OF THIS BUILDING FOR HUMAN HABITATION IS PROHIBITED AND UNLAWFUL. TO BE VACATED WITHIN 1 DAY (5/2/2023)."

82.    The notice further stated that it was posted "pursuant to section 5 of the Property Maintenance Code of the City of Plainfield."

83.     On May 2, 2023, the Municipal Defendants forced all residents of the building at 705 Kensington Avenue out of their homes, and the building was locked and secured to prevent the residents' reentry.

84.    On May 3, 2023, the Municipal Defendants posted additional notices at or near the Kensington property which indicated that the remainder of the Kensington buildings would be closed within twenty-four hours.  Copies of the May 3, 2023 notices are attached as **Exhibit B**.

85.    These notices were signed by Defendant Leticia Velez and provided the same limited information as the first notice placed on May 1.

86.    On May 4, 2023, the Municipal Defendants forced all residents of the remaining Kensington buildings out of their homes, and the buildings were locked and secured to prevent the residents' reentry.

87.    For years, the Kensington buildings remained closed and vacant.  In 2025, members of the Class learned that the Landlord Defendants and/or their

successors in interest have begun re-renting units in Kensington at rental amounts that greatly exceed the rental amount paid by Plaintiffs and the Class.

88.    On June 26, 2023, the Municipal Defendants posted at least one notice at or near the Arlington buildings which indicated that they would be closed within twenty-four hours.  A copy of the notice is attached as **Exhibit C.**

89.    The Arlington notice was signed by Defendant Velez and provided the same limited information as the first notice placed at the Kensington property on May 1.

90.    Although Arlington comprises two separate, standalone buildings, the Municipal Defendants closed the "entire structure."

91.    On June 27, 2023, the Municipal Defendants forced all residents of the Arlington buildings out of their homes, and the buildings were locked and secured to prevent the residents' reentry.

92.    The Arlington buildings remain closed and vacant.

93.    On August 8, 2023, the Municipal Defendants posted a notice at or near 501 West 7th which indicated that the building would be closed within twenty-four hours.  A photograph of the notice placed on 501 West 7th is attached as **Exhibit D**.

94.    The 501 West 7th notice was signed by Defendant Velez and provided the same limited information as the Arlington and Kensington notices.

95.    On August 9, 2023, the Municipal Defendants forced all residents of the 501 West 7th out of their homes, and the building was locked and secured to prevent the residents' reentry.

96.    501 West 7th remains closed and vacant.

97.    After closing 501 West 7th, there was a public uproar over the Municipal Defendants' policy of forcibly displacing residents of the City with little notice.

98.    After the press began highlighting the Municipal Defendants' actions, they ceased executing their policy.

99.    Upon information and belief, the Municipal Defendants had plans to close the building immediately adjacent to 501 West 7th—515 West 7th—but opted not to do so after the negative attention in the press.

100.    In September 2023, after completing the closures, the Plainfield City Council passed a resolution to designate an area in the City that includes all the Buildings as a "condemnation redevelopment area."[7]

---

[7] *See* Plainfield City Council Resolution 323-23, available at page 69 at the following link:
https://plainfieldcitynj.iqm2.com/Citizens/FileOpen.aspx?Type=15&ID=1197&Inline=True.

101.   The resolution noted that, if the area were to receive that designation after the completion of a study, the City could use its eminent domain power to take the Buildings from the Landlord Defendants for redevelopment purposes.[8]

102.   While that effort failed after an unsuccessful litigation with the Landlord Defendants (described below), in June 2024, the City Council passed yet another resolution designating the Buildings as being in areas in need of redevelopment.[9]

103.   The City thus appears to continue to use its eminent domain powers to take ownership of the Buildings and to redevelop the properties on which they sit.

## C. The City Fails to Provide the Class with Adequate Notice or an Opportunity to be Heard

104.   The City's actions forcibly displaced approximately three hundred people.

105.   While there is no doubt that the Landlord Defendants failed to properly maintain the Buildings, the Municipal Defendants' decision to forcibly remove residents from their homes with hours' notice was unnecessary, unjustified, and executed in an unfair and unlawful manner.

---

[8] *Id.*

[9] *See* Plainfield City Council Resolution 275-24, available at page 67 at the following link:
https://plainfieldcitynj.iqm2.com/Citizens/FileOpen.aspx?Type=15&ID=1208&Inline=True.

106.   The Municipal Defendants have never adequately explained the need to forcibly displace Plaintiffs and the Class.  Plaintiffs and the Class do not know why the Municipal Defendants forced them out of their homes on such short notice. Nor have the Plaintiffs and the Class been informed why the Municipal Defendants opted to displace them without first attempting to take any steps to direct the Landlord Defendants to correct the conditions in the Buildings.

107.   The Municipal Defendants could, for example, have sued the Landlord Defendants and sought penalties, including fines, imprisonment, and the appointment of a receiver if they did not correct the conditions.  Such action could have resulted in Plaintiffs' and the Class's having safe and habitable homes without resulting in their forcible, mass displacement.

108.   At no time did the Municipal Defendants provide Plaintiffs and the Class with notice of or information about how they could be heard regarding the closures and how to challenge them.

109.   At no time did the Municipal Defendants provide Plaintiffs and the Class with an opportunity to be heard or to challenge the decision to close the Buildings—even after the closures.

110.   While the Municipal Defendants purportedly relied upon the PPMC to close the Buildings, they failed to follow even its basic provisions on required

notices and hearings.  The relevant excerpts of the PPMC are annexed hereto as **Exhibit E** and summarized in the following paragraphs.

111.  According to PPMC § 4.01, "[t]he person charged with the responsibility of enforcement of this code shall also be known as the Public Officer." Defendant Velez is the Public Officer, and she was so designated at all relevant times.

112.  PPMC § 5.01 allows the Public Officer to inspect a building believed to be uninhabitable and make a preliminary finding regarding its habitability.

113.  The Public Officer is required to serve the owner and occupants with a notice specifying the date of a hearing regarding these preliminary findings ten to thirty days after serving such notice.

114.  Additionally, the notice must advise the owner and occupants of the inspection results and the basis for determining whether continued occupancy would be dangerous.  *Id.* §§ 5.01, 5.02.

115.  The Municipal Defendants never provided Plaintiffs and the Class with a preliminary finding.

116.  The Municipal Defendants never provided Plaintiffs and the Class with a notice specifying the date of any hearing.

117.    The Municipal Defendants never provided Plaintiffs and the Class with a specific basis for their determinations that the Buildings were not fit for human habitation.

118.    Moreover, the Municipal Defendants posted notices that were only in English.  Nearly all of the members of the Class are monolingual Spanish-speakers, and, upon information and belief, the Municipal Defendants knew or should have known this.

119.    PPMC § 5.03 provides that the Public Officer shall make a final determination *after* holding a hearing and evaluating certain health and safety factors.[10]  At that stage, the Public Officer has the following three options: (1) to allow a limited time of occupancy, not to exceed thirty days, upon condition that all violations, recited in the order are corrected, or abated within that time; (2) to order the building vacated until the conditions are reduced and the order revoked; or (3) to order the building vacated and demolished within sixty days.

120.    But no hearing was held prior to the closures, and Defendant Velez did not pursue any of the three options available under the PPMC.

---

[10] PPMC § 5.03 references the hearing contemplated in PPMC § 4.09.  Those are hearings that may be requested by people affected by notices served by the Public Officer upon "persons responsible for the correction" of PPMC violations— presumably property owners.  Critically, the notices contemplated in Section 4 of the PPMC also require information regarding "the right to request a hearing."  PPMC § 4.07.

121.   Specifically, Municipal Defendants failed to provide Plaintiffs and the Class with notice specifying how to request a post-deprivation hearing regarding the closures, and no hearing was, in fact, ever held regarding the closures.

122.   Instead of pursuing any of the three options available under the PPMC, the Municipal Defendants chose to instead pursue an unlawful fourth option: to forcibly displace all residents of the Buildings within twenty-four hours of their first and only notice indicating the Buildings would be closed.

123.   As of the filing of this Complaint, nearly two years since the Municipal Defendants began forcibly displacing Plaintiffs, they have not taken any actions consistent with their purported belief that the Buildings were in an emergency state of disrepair.  For example, none of the Buildings have been demolished, nor have the Municipal Defendants taken any other action to protect people who live in the vicinity of the Buildings.

124.   Rather, after the City's litigation with the Landlord Defendants failed (as discussed below), the Buildings were sold, improved, and are now being advertised for rental—at prices that far exceed what Plaintiffs and members of the Class had been paying.

## D. A Court Holds that the City Has Unclean Hands Based on the Closures and Declares the Notices to Be Nullities

125.   On September 1, 2023, just weeks after closing 501 West 7th, the City filed a complaint against the Landlord Defendants.

126.   Nearly simultaneously with the filing of that litigation, the City made clear that it intended to utilize New Jersey's condemnation laws and to use its eminent domain powers and thereafter redevelop the lots on which the Buildings are located.  Specifically, in September 2023, the City Council passed a resolution to designate an area in the City that includes all the Buildings as a "condemnation redevelopment area."[11]

127.   The resolution noted that if the area were to receive that designation, the City could use its eminent domain power to take the Buildings from the Landlord Defendants for redevelopment purposes.

128.   Upon information and belief, the City filed its lawsuit against the Landlord Defendants in furtherance of its plan to use its eminent domain powers and take ownership of Buildings.

129.   As a first step in that process, the City filed a motion for the appointment of a receiver as a form of preliminary relief.

130.   On October 23, 2023, the Honorable Robert Mega, P. J. Ch., denied the City's motion.[12]

---

[11]  *See* Plainfield City Council Resolution 323-23, available at page 69 at the following link:
https://plainfieldcitynj.iqm2.com/Citizens/FileOpen.aspx?Type=15&ID=1197&Inline=True.

[12]  *See* Order, *City of Plainfield v. Cyclone Investments, LLC*, Docket No. UNN-C-000088-23 (N.J. Sup. Ct. Oct. 23, 2023), attached hereto as **Exhibit F**.

131.  Judge Mega held that the City failed to demonstrate legal or equitable grounds to have a receiver appointed.

132.  Specifically, Judge Mega held that the public interest weighed against the City because it had "unclean hands" in that the City failed to abide by the state and local laws that govern the circumstances under which a building can be closed for being unfit for human habitation.[13]

133.  Judge Mega determined that the PPMC "provides the city with enforcement mechanisms and remedies at law," and  faulted the City for  displacing Plaintiffs and the Class instead of exercising its housing-maintenance enforcement power.[14]

134.  Judge Mega thus held that the City caused "substantial harm to [the Class] by requiring them to vacate the buildings rather than first provide [the Landlord] Defendants the opportunity to cure the alleged violations and prevent people from having to relocate."[15]

135.  In June 2024, the Landlord Defendants moved for summary judgment on their counterclaims regarding the validity of the notices and the process that the Municipal Defendants had used.  Judge Mega granted that motion in part.[16]

---

[13] *Id.* at 10.
[14] *Id.* at 5.
[15] *Id.* at 10.
[16] *See* Order, *City of Plainfield v. Cyclone Investments, LLC*, Docket No. UNN-L-243-23 (N.J. Sup. Ct. Jun. 20, 2024), attached hereto as **Exhibit G**.

136.   Specifically, he held that the Municipal Defendants had failed to comply with, among others, the following the procedural requirements set forth in N.J.S.A. 40:48-2.5, the statute that allows municipalities to close buildings that are unfit for human habitation:

> • The municipality must serve the "the owner of and parties in interest in such building a complaint stating the charges" and provide the owner and other parties with "the right to file an answer to the complaint and to appear in person, or otherwise." N.J.S.A. 40:48-2.5(b).
>
> • The municipality must provide notice to the owner and parties in interest and state in writing the Public Officer's "findings of fact in support of such determination" then issue an order "requiring the repair, alteration or improvement of the said building to be made by the owner, within a reasonable time." N.J.S.A. 40:48-2.5(c).
>
> • The municipality must wait for a "reasonable time" before vacating the building. N.J.S.A. 40:48-2.5(c)(2).
> . . . .

*See* Ex. B.

137.   Judge Mega additionally held that the PPMC "does not comply with the due process procedures set forth in the relevant statutory law" and that it must be "revised" to comply.[17]

138.   As a result, Judge Mega held that the notices issued to the Landlord Defendants "must be voided *ab initio*."[18]

---

[17] *Id.* at 21-22.
[18] *Id.* at 22.

139.   As a result of the court's holding, the notices provided to Plaintiffs and the Class are legal nullities and, for legal purposes, do not exist and have never existed.

140.   As of this writing, there is no indication that the PPMC has been modified or that other actions have been taken by the Municipal Defendants to protect the interests of residential tenants living in buildings that the City deems to be unfit for human habitation.

## E. The City Has Closed Buildings Without Adhering to Due Process Requirements Before

141.   The closure of the Buildings is not the first instance in which the City has closed Buildings without adhering to constitutional and other legal requirements.

142.   Based on the litigation between the City and the Landlord Defendants, it is evident that the City has used unconstitutional means to take property from owners and tenants without due process for decades.

143.   Specifically, upon information and belief, the City has also closed the following properties without providing proper due-process protections:

a.  442 Orchard Place in 1999;

b.  300-04 Grant Avenue in 1999;

c.  227-31 Clinton Avenue in 2011;

d.  720/722 West Front Street in 2011;

e.  540-44 East Front Street in 2011;

     f.  452 W. 5th Street in 2011;

     g.  417-19 East 7th Street in 2011;

     h.  1008 West 3rd Street in 2019;

     i.  962 West Front Street in 2020; and

     j.  1353 West 3rd Street in 2020.

144.   It is thus clear that the Municipal Defendants' behavior with respect to the Buildings is part of a policy or custom that they have been implementing for decades.

## F. Plaintiffs and Other Members of the Class Are Seriously Harmed

*Sulma Pinson and Gerardo Arias – 705 Kensington Avenue*

145.   Plaintiffs Sulma Pinson and Gerardo Arias lived together at 705 Kensington Avenue for eight years, until the closure, with their two children, who are, respectively, fourteen and nine years old.

146.   Ms. Pinson and Mr. Arias paid $1,800.00 dollars a month in rent for their apartment. They also paid an $1,800.00 security deposit.

147.   Prior to the forcible displacement, Ms. Pinson and Mr. Arias paid their rent in full, including for May 2023.

148.   Prior to the forcible displacement, Ms. Pinson and Mr. Arias lived in conditions that violated the warranty of habitability and applicable housing codes.

149.   For example, rainwater would flood the family's kitchen, causing substantial property damage.

150.   Ms. Pinson recorded videos of rain pouring into her kitchen and showed them to agents of the Landlord Defendants.  She also notified City inspectors, one of whom personally observed the leak in her kitchen.

151.   Neither the Landlord Defendants nor Municipal Defendants took any action to correct this serious condition.

152.   On or around Saturday April 29, 2023, City firefighters were called to their building in response to a leak that may have been caused by a pipe that had burst.  Mr. Arias, Ms. Pinson, and their children were instructed by agents of the Landlord Defendants to go to a hotel until the following Monday to allow the condition to be corrected.

153.   On Monday May 1, 2023, before the family had returned to their apartment, the building superintendent called Mr. Arias and informed him that the building would be closed the next day and that the family could not return to the apartment for two weeks.  This was the first time the family had heard about the possibility of the building being closed for that length of time.

154.   The family returned to the building on May 1, 2023, and saw the Municipal Defendants' notice regarding the closure.

155. On May 2, 2023, City officials came to 705 Kensington and went from door to door to enforce the Municipal Defendants' directive that residents vacate.

156. Ms. Pinson, Mr. Arias, and their two children used the limited time that the Municipal Defendants provided to pack what they could. But they did not have sufficient time, and many items of sentimental and financial value were left behind. They also lost almost all of their furniture.

157. After being forcibly displaced, they were not able to return and collect more of their belongings.

158. Both Mr. Arias and Ms. Pinson had false hope, based on statements made by City elected officials, that they would be able to return home within a few weeks. In reality, there was never a plan to allow them or other members of the Class to return.

159. The City provided a hotel room for Ms. Pinson, Mr. Arias, and their children to live in for only five days, after which the family was on its own.

160. For months, the family experienced homelessness.

161. When they could find a friend to stay with, they slept on the floors of their homes. Given the disruption to their lives, at times, the family went without food.

162. Eventually, with no help from any of the Defendants, Ms. Pinson and Mr. Arias found an apartment for their family to live in, but it was much more

expensive than their former residence; whereas the rent for their prior apartment was $1,800.00 per month, the new apartment is $2,565.00 per month.

163.   To this day, neither Mr. Arias nor Ms. Pinson has been informed of why they were forcibly removed from their home.

164.   The experience was traumatic for Ms. Pinson, Mr. Arias, and their two children.  Each member of the family has suffered psychologically, emotionally, and physically as a direct result of the Municipal Defendants' actions in forcibly displacing them.  For example, Mr. Pinson has developed suicidal thoughts.  The experience has also had long-term emotional effects on the one of their children.

165.   The Municipal Defendants never provided notice to Mr. Arias or Ms. Pinson of the reason they had to leave their home on such short notice.

166.   The Municipal Defendants never provided notice to Mr. Arias or Ms. Pinson that they could request a hearing regarding the closure.

167.   The Municipal Defendants never provided notice to Mr. Arias or Ms. Pinson that they could challenge the purported basis for the closure.

168.   The Municipal Defendants made no effort after the closure to allow Mr. Arias or Ms. Pinson to be heard regarding the closure.

169.   The Landlord Defendants have not refunded, in whole or in part, the rent that Mr. Arias and Ms. Pinson paid for May 2023, the month of displacement.

170.   The Landlord Defendants have not returned the security deposit that Mr. Arias and Ms. Pinson paid.

171.   Prior to their forcible displacement, Mr. Arias and Ms. Pinson paid the full rent for the apartment, even though the Landlord Defendants failed to provide them with the bargained-for habitable home.

*Juan Rosales – 709 Kensington Avenue*

172.   In May 2023, Plaintiff Juan Rosales lived at 709 Kensington Avenue with his partner Maria, his then-two-year-old child, and his sister.   At that time, Maria was in her eighth month of pregnancy.

173.   Mr. Rosales moved into his apartment in 2022 and paid a security deposit of $2,000.00 to Kensington's superintendent.

174.   Mr. Rosales received a lease several weeks later.   His rent was $2,000 per month.

175.   Prior to the displacement, Mr. Rosales paid his rent in full, including for May 2023.

176.   On or about May 3, 2023, while Mr. Rosales was at work, Maria called him to inform him that a notice had been posted at or near the building, which stated that they needed to leave.

177.   The family did not know what to do and stayed at their apartment that night.

178.   The next morning, on May 4, 2023, City police and inspectors came to the building and instructed the Rosales family to leave.  They were given five hours to remove their belongings.

179.   The City provided the Rosales family with a hotel room for five days.

180.   After those five days, the family experienced homelessness.

181.   Specifically, after the five days, the Rosales family, including Maria, slept in their car for a week.

182.   After that, they slept with friends for another week before finding another apartment in South Plainfield.

183.   After being forcibly displaced and unhoused, Maria had complications with her pregnancy.

184.   Mr. Rosales and his family have experienced severe emotional distress due to the sudden displacement and subsequent period of homelessness.

185.   In addition to leaving being unable to pack items of financial value, Mr. Rosales's toddler lost toys and other objects of sentimental value.

186.   After being forcibly displaced, the Rosales family could only find a suitable apartment in South Plainfield, a town that, unlike Plainfield, lacks a free preschool program.  As such, the family had to incur the expense of childcare for the 2023-2024 school year, which they otherwise would not have incurred.

187.    Besides the five days in a hotel room, Mr. Rosales and his family received no other help from the City.

188.    The Municipal Defendants never provided notice to Mr. Rosales of the reason his family had to leave their home on such short notice.

189.    The Municipal Defendants never provided notice to Mr. Rosales that he could request a hearing regarding the closure.

190.    The Municipal Defendants never provided notice to Mr. Rosales that he could challenge the purported basis for the closure.

191.    The Municipal Defendants made no effort after the closure to allow Mr. Rosales to be heard regarding the closure.

192.    The Landlord Defendants have not refunded, in whole or in part, the rent that Mr. Rosales paid for May 2023, the month of displacement.

193.    The Landlord Defendants have not returned the security deposit that Mr. Rosales paid.

194.    Prior to his forcible displacement, Mr. Rosales paid the full rent for the apartment, even though the Landlord Defendants failed to provide him with the bargained-for habitable home.

*Nelly Torres – 709 Kensington Avenue*

195.    Plaintiff Nelly Torres lived in an apartment at 709 Kensington Avenue for almost thirteen years, until the closure.  She lived with her husband and two children.

196.    Ms. Torres's rent was $1,750 per month, which she paid in full, including for May 2023.

197.    The apartment had persistent conditions that violated the warranty of habitability.

198.    For example, there was an infestation of rats and insects.

199.    There also was a persistent leak from the ceiling, which damaged the family's personal belongings, such as their carpet.

200.    Ms. Torres informed agents of the Landlord Defendants about these conditions, but they did not take any steps to correct them.

201.    Ms. Torres learned on May 3, 2023 that the Municipal Defendants were going to close the building on May 4, 2023.

202.    On May 4, 2023, Ms. Torres attempted to pack as much as she could, but she was unable to take her furniture.  As a result, Ms. Torres and her family lost many items of financial and sentimental value.

203.    The City provided Ms. Torres and her family with a hotel room for five days.  After that, they provided no additional assistance.

204. After being forcibly displaced, Ms. Torres and her family lived with her brother for one month. She had to live in his basement with one of her children who has disabilities, which caused the family immense stress and harm.

205. Finally, with assistance from Bridges Outreach Project Connect Union County, Ms. Torres and her family were able to find alternative housing.

206. Ms. Torres' rent increased by $1,000 per month to $2,750 per month.

207. Ms. Torres and her family were devastated by the forcible displacement, which left them distraught and in shock.

208. The Municipal Defendants never provided notice to Ms. Torres of the reason her family had to leave their home on such short notice.

209. The Municipal Defendants never provided notice to Ms. Torres that she could request a hearing regarding the closure.

210. The Municipal Defendants never provided notice to Ms. Torres that she could challenge the purported basis for the closure.

211. The Municipal Defendants made no effort after the closure to allow Ms. Torres to be heard regarding the closure.

212. The Landlord Defendants have not refunded, in whole or in part, Ms. Torres' rent for May 2023, the month of displacement.

213. The Landlord Defendants have not returned the security deposit that Ms. Torres paid.

214.   Prior to her forcible displacement, Ms. Torres paid the full rent for the apartment, even though the Landlord Defendants failed to provide her with the bargained-for habitable home.

*Eneida Vasquez – 701 Kensington Avenue*

215.   Plaintiff Eneida Vasquez lived in an apartment at 701 Kensington Avenue for three years, until the closure, with her husband and two children.

216.   Her rent was $1,750, which she paid in full, including for May 2023.

217.   The apartment had persistent conditions that violated the warranty of habitability and applicable housing codes.  For example:

a.  There was an infestation of rats and insects, which prevented Ms. Vasquez from leaving any food in the kitchen;

b.  There was a persistent leak in the apartment from the ceiling; and

c.  There were periods with no heat.

218.   Ms. Vasquez informed agents of the Landlord Defendants about these conditions, but they did not take any steps to correct them.

219.   Ms. Vasquez learned on May 3, 2023 that the Municipal Defendants were going to close the building on May 4, 2023.

220.   She and her family were surprised, shocked, and frightened.  It was particularly challenging to tell her children, one of whom has a developmental disability.

221.   Ms. Vasquez's husband was away on a work trip in California when she learned of the impending closure.  He had to fly from California to New Jersey to assist her on almost no notice.

222.   Ms. Vasquez could not take all of her belongings with her.  The items left behind are worth thousands of dollars and had immense sentimental value.

223.   The City provided Ms. Vasquez, her husband, and her children with a hotel room for five days.  After that, the City provided no additional assistance.

224.   Ms. Vasquez requested assistance in finding new housing from the City, but the City refused to provide such assistance.

225.   Finally, with assistance from Bridges Outreach Project Connect Union County, Ms. Vasquez and her family were able to find housing.

226.   Ms. Vasquez's rent increased to $2,750 per month. Her previous rent was $1,750 per month.

227.   The Municipal Defendants never provided notice to Ms. Vasquez of the reason her family had to leave their home on such short notice.

228.   The Municipal Defendants never provided notice to Ms. Vasquez that she could request a hearing regarding the closure.

229.   The Municipal Defendants never provided notice to Ms. Vasquez that she could challenge the purported basis for the closure.

230.    The Municipal Defendants made no effort after the closure to allow Ms. Vasquez to be heard regarding the closure.

231.    The Landlord Defendants have not refunded, in whole or in part, Ms. Vasquez's rent for May 2023, the month of displacement.

232.    The Landlord Defendants have not returned the security deposit that Ms. Vasquez paid.

233.    Prior to her forcible displacement, Ms. Vasquez paid the full rent for the apartment, even though the Landlord Defendants failed to provide her with the bargained-for habitable home.

*Roosevelt Riascos – 715 Arlington Avenue*

234.    Roosevelt Riascos lived at 715 Arlington Avenue with his adult cousin and nephew from 2021 until the closure.

235.    Mr. Riascos paid the building manager a $2,700 security deposit to get the keys.

236.    Mr. Riascos subsequently received a lease for $1,800 per month.  He paid his rent in full, including for June 2023.

237.    In 2022, after the City temporarily shut the building, Defendant Arlington 33 LLC increased Mr. Riascos' rent to $2,000 per month.

238.   On June 26, 2023, Mr. Riascos saw a notice on the door of his building stating that he had twenty-four hours to leave his home.  This was the only notice he received.

239.   Not understanding the severity of the situation, Mr. Riascos went to work the following day.

240.   When Mr. Riascos returned from work, City police were at the building and told him he had to leave.

241.   Mr. Riascos had three hours to remove his belongings while the building manager yelled at the residents to hurry up.

242.   That night, Mr. Riascos paid for a hotel room.

243.   The City provided Mr. Riascos with a hotel for the next five nights, after which he stayed with a friend for fifteen days before finding a new apartment.

244.   Unable to pack everything, Mr. Riascos lost things of sentimental and financial value, including a mattress, refrigerator, and a television.

245.   Additionally, Mr. Riascos missed several days at work due to the closures.  It is now more difficult for him to get to work.  He does not have a car, and his new apartment is farther away from his workplace.

246.   In addition to his economic damages, the closure caused Mr. Riascos emotional and psychological harm.

247.    The Municipal Defendants never provided notice to Mr. Riascos of the reason his family had to leave their home on such short notice.

248.    The Municipal Defendants never provided notice to Mr. Riascos that he could request a hearing regarding the closure.

249.    The Municipal Defendants never provided notice to Mr. Riascos that he could challenge the purported basis for the closure.

250.    The Municipal Defendants made no effort after the closure to allow Mr. Riascos to be heard regarding the closure.

251.    The Landlord Defendants have not refunded, in whole or in part, Mr. Riascos' rent for June 2023, the month of displacement.

252.    The Landlord Defendants have not returned the security deposit that Mr. Riascos paid.

253.    Prior to his forcible displacement, Mr. Riascos paid the full rent for the apartment, even though the Landlord Defendants failed to provide him with the bargained-for habitable home.

*Miguel Asig – 717 Arlington Avenue*

254.    Miguel Asig lived at 717 Arlington Avenue for approximately four years until the closure.

255.    His monthly rent was $1,350.00, and he paid a security deposit in the same amount.  Mr. Asig paid his rent in full, including for June 2023.

256.   The apartment had persistent conditions that violated the warranty of habitability and applicable housing codes.  For example, his radiator was leaking water; he did not receive heat and hot water for days; and he had two broken windows.

257.   The Landlord Defendants were aware of the conditions in his apartment but did little or nothing to correct them.

258.   On June 26, 2023, Mr. Asig saw the notice that the Municipal Defendants were going to close the building in twenty-four hours.

259.   On June 27, 2023, inspectors from the City came to his building.

260.   After questioning the inspector about the basis for the closure, Mr. Asig was physically forced off the property by the City police.  Subsequently, the City put locks on the building doors.

261.   Mr. Asig was unable to pack many of his belongings, which had significant financial and sentimental value.

262.   Although the City provided him with a later opportunity to retrieve his belongings, most of his things had been stolen or discarded by that point.

263.   Mr. Asig has experienced severe anxiety and depression due to the displacement.

264.   The Municipal Defendants never provided notice to Mr. Asig of the reason his family had to leave their home at such short notice.

265.   The Municipal Defendants never provided notice to Mr. Asig that he could request a hearing regarding the closure.

266.   The Municipal Defendants never provided notice to Mr. Asig that he could challenge the purported basis for the closure.

267.   The Municipal Defendants made no effort after the closure to allow Mr. Asig to be heard regarding the closure.

268.   The Landlord Defendants have not refunded, in whole or in part, Mr. Asig's rent for June 2023, the month of displacement.

269.   The Landlord Defendants have not returned the security deposit that Mr. Asig paid.

270.   Prior to his forcible displacement, Mr. Asig paid the full rent for the apartment, even though the Landlord Defendants failed to provide him with the bargained for habitable home.

*The Torralba/Blanco Family – 501 West 7th Street*

271.   Yolanda Torralba and Luis Blanco, as well as their daughter and minor granddaughter lived together at 501 West 7th for twenty-seven years until the closure.

272.   Mr. Blanco had a lease for all the years he lived in the apartment.  He had also paid the security deposit that increased over time—ultimately to $1,500.00.

273.    In fact, Mr. Blanco and Ms. Torralba raised all three of their children in the apartment, which had immense sentimental value to them.

274.    They experienced a range of unhealthy and dangerous conditions issues in their home. For example:

      a.  A ceiling collapsed on the one of the children in the apartment;

      b.  Frequently, there would be no heat until the end of December;

      c.  There were regular periods without hot water, cold water, and/or any water at all;

      d.  There was persistent mold on the bathroom ceiling;

      e.  Corners of the bathroom shelving would constantly break off, occasionally injuring members of the family;

      f.  Common areas of the building were filled with trash and broken glass; and

      g.  The front and back entrances of the building were frequently unlocked, which created security risks.

275.    They informed agents of the Landlord Defendants about these conditions, but Landlord Defendants did little or nothing to correct them.

276.    Ms. Torralba and Mr. Blanco paid thousands of dollars to remedy conditions that the Landlord Defendants refused to fix, and they have never been compensated.

277.    Mr. Blanco and Ms. Torralba informed the City of the conditions, but the City did nothing in response.

278.    Mr. Blanco and Ms. Torralba observed City inspectors at the building over the years, but City inspectors took no steps to force the Landlord Defendants or their predecessors to correct the conditions.

279.    Although Mr. Blanco and Ms. Torralba were traveling at the time, their daughter and granddaughter were at 501 West 7th at the time of the closures.

280.    Their daughter informed them that the City had posted a "Notice of Condemnation."  She then called her parents in tears to inform them of what was occurring.  Ms. Torralba became distressed that her daughter and granddaughter would have to sleep on the street that night.

281.    After being forcibly displaced, their daughter and granddaughter went to a hotel using a voucher provided by the City.

282.    When they arrived at 8:00 p.m., the employee at the front desk said that they had no availability.  As a result, they had to spend the night in their car.

283.    The forcible displacement has taken an emotional toll on Ms. Torralba and Mr. Blanco, as well as their granddaughter.

284.    When Mr. Blanco and Ms. Torralba returned to New Jersey, City officials allowed them only four hours a day for two days to collect the belongings in their home of twenty-seven years.

285.   When Ms. Torralba and Mr. Blanco re-entered their apartment to attempt to recover their belongings, they learned that things were missing—either stolen or discarded.   Those items included items of immense financial and sentimental value.

286.   Since the closures, Mr. Blanco has suffered three heart attacks. Because of his weakened condition, he has been unable to work.

287.   Due to Mr. Blanco's condition, the City put him and Ms. Torralba in a hotel for five months.

288.   The City, however, never helped Ms. Torralba and Mr. Blanco find a new place to live after the hotel stay.

289.   For months, Ms. Torralba and Mr. Blanco had to alternate living with each of their sons.

290.   They did not find alternative permanent housing until spring 2024.

291.   The forcible displacement has been emotionally traumatic for Ms. Torralba and Mr. Blanco.

292.   To Ms. Torralba, there was incalculable sentimental value in her apartment, as she raised all of her children there.  Ms. Torralba, even to this day, still parks the car in front of the building.

293.   The Municipal Defendants never provided notice to the Torralba/Blanco family of the reason his family had to leave their home on such short notice.

294.   The Municipal Defendants never provided notice to the Torralba/Blanco family that they could request a hearing regarding the closure.

295.   The Municipal Defendants never provided notice to the Torralba/Blanco family that they could challenge the purported basis for the closure.

296.   The Landlord Defendants have not refunded, in whole or in part, the Torralba/Blanco family's rent for August 2023, the month of displacement

297.   The Landlord Defendants have not returned the security deposit that the Torralba/Blanco family paid.

298.   Prior to their forcible displacement, the Torralba/Blanco family paid the full rent for the apartment, even though the Landlord Defendants failed to provide them with the bargained-for habitable home.

## CLASS ACTION ALLEGATIONS

299.   This action is brought by the Plaintiffs as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), (b)(3) and (c)(4) and for all claims asserted herein, on behalf of themselves.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements.  The following are the initially defined Class and Sub-Classes:

300.    **The Class**: The Class comprises all persons in the following sub- and sub-sub-classes: Arlington Sub-Class; Arlington Sub-Sub-Class; Kensington Sub-Class; Kensington Sub-Sub-Class; 501 West 7th Sub-Class; and 501 West 7th Sub-Sub-Class.

301.    **Arlington Sub-Class**: All persons residing at 715–725 Arlington Avenue, Plainfield, New Jersey 07060 at any point between February 25, 2019, and June 27, 2023.

302.    **Arlington Sub-Sub-Class**: All persons residing at 715–725 Arlington Avenue, Plainfield, New Jersey 07060 between June 26, 2023, and June 27, 2023 or who were otherwise evicted, displaced, or removed from their homes by the Municipal Defendants on or around June 27, 2023.

303.    **Kensington Sub-Class**: All persons residing in the 701–711 Kensington Avenue, Plainfield, New Jersey 07060 at any point between November 2020 and May 5, 2023.

304.    **Kensington Sub-Sub-Class**: All persons residing at 701–711 Kensington Avenue, Plainfield, New Jersey 07060 between May 1, 2023, and May 5, 2023, or who were otherwise evicted, displaced, or removed from their homes by the Municipal Defendants on or around May 2, 2023, and May 4, 2023.

305.  **501 West 7th Sub-Class**: All persons residing in the 501 West 7th Street, Plainfield, New Jersey 07060 building from October 2021 through August 9, 2023.

306.  **501 West 7th Sub-Sub-Class**: All persons residing at 501 West 7th Street, Plainfield, New Jersey 07060 building between August 8, 2023, and August 9, 2023, or who were otherwise evicted, displaced, or removed from their homes by the Municipal Defendants on or around August 9, 2023.

307.  Plaintiffs hereby reserve the right to amend or modify the Class, Sub-Class, and Sub-Sub-Class definitions with greater specificity or division after having had an opportunity to conduct discovery.

308.  Each of the proposed classes meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

309.  **Numerosity**: Although the exact number of Class members is uncertain and can only be ascertained through appropriate discovery, including discovery of Defendants' records, the Class is so numerous that joinder of all members is impracticable.  Approximately three hundred individuals were affected.  The Class is comprised of an easily ascertainable set of persons during the Class Period from Defendants' own records as well as the potential members' records.

310.  **Commonality and Predominance**: There are questions of law and fact common to the Class, which predominate over any questions affecting only

individual Class members.  A class action is superior to other available methods of fair and efficient adjudication of the controversy.  Questions of law and fact are common to all Class members.  These common questions of law and fact include, without limitation:

    a. Whether the Municipal Defendants violated Plaintiffs' procedural and substantive due process rights afforded them under U.S. Const. Amend. XIV, § 1 and Article 1, paragraph 1 of the New Jersey Constitution by forcibly displacing them from their homes without adequate notice or an opportunity to be heard;

    b. Whether the Landlord Defendants breached an implied warranty of habitability by failing to timely take action to correct and repair conditions in the Buildings that violated the requirements of the New Jersey Administrative Code and the Plainfield Property Maintenance Code, including, but not limited to persistent leaks, lack of heat, and infestations of vermin;

    c. Whether the Landlord Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. by failing to timely take action to correct and repair conditions in the Buildings that violated the requirements of the New Jersey Administrative Code and the Plainfield Property Maintenance

Code, including, but not limited to persistent leaks, lack of heat, and infestations of pests;

d. Whether the Landlord Defendants violated the New Jersey Security Deposit Law, N.J.S.A. 46:8-19 et seq. by failing to return the security deposit to each Plaintiff and member of the Class after the displacement;

e. Whether the Landlord Defendants breached their leases with each Plaintiffs and member of the Class by collecting and refusing to refund rent for months when each Plaintiffs and member of the Class were denied possession and peaceful enjoyment of their homes;

f. Whether the Defendants' actions and omissions described in this Complaint injured each Plaintiff and member of the Class and caused them to sustain damages;

g. Whether as a result of Defendants' omissions, representations and conduct, Plaintiffs and the Class are entitled to injunctive relief in the form of:

- a right of first refusal to return to the Buildings, or any replacement buildings on the same lot as the Buildings, at the same rent amount as they were paying prior to the displacement;

- amendments to the Plainfield Property Maintenance Code to ensure that the due process rights of residential occupants are protected in the event

the City deems it appropriate to attempt to close a building for habitability reasons; and

- any other such relief as the Court may deem appropriate.

h. Whether Plaintiffs and the Class are entitled to recover compensatory damages from the Municipal Defendants to compensate them for the harm they endured as a result of the Municipal Defendants forcibly displacing them from their homes without adequate notice or an opportunity to be heard;

i. Whether Plaintiffs and the Class are entitled to recover punitive damages from the Defendant Velez based on her reckless or callous indifference to the constitutional rights of Plaintiffs and the Class;

j. Whether Plaintiffs and the Class are entitled to recover compensatory damages from the Landlord Defendants to compensate them for the harm they endured as a result of the Landlord Defendants' willful refusal to correct and repair conditions in the Buildings that violated the requirements of the New Jersey Administrative Code and the Plainfield Property Maintenance Code, including, but not limited to persistent leaks, lack of heat, and infestations of pests;

k. Whether Plaintiffs and the Class are entitled to recover punitive damages from the Landlord Defendants as a result of their reckless and conscious

disregard for the safety of Plaintiffs and the Class based on their refusal to correct and repair conditions in the Buildings that violated the requirements of the New Jersey Administrative Code and the Plainfield Property Maintenance Code, including, but not limited to persistent leaks, lack of heat, and infestations of pests; and

l.  Whether Plaintiffs and the Class are entitled to recover attorney's fees and costs.

311.  **Typicality:** Plaintiffs' claims are typical of the claims of the Class members in that Plaintiffs, like all Class members, were harmed by Defendants' misconduct.  Plaintiffs assert that they sustained damages as a result of the Landlord Defendants' failure to maintain the Buildings and then the Municipal Defendants actions in closing them without due process of law.  Plaintiffs assert that they have incurred or will incur the cost of replacing or repairing the damage and/or loss of property as well.  Plaintiffs' claims arise from the same course of conduct as that which gives rise to the claims of the Class members.  Plaintiffs' claims are also based on the same legal theories as claims of the Class members.

312.  **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are members of the Class, and each Sub-Class and Sub-Sub-Class has at least one named Plaintiff in it.  Plaintiffs have retained counsel who are experienced in class-action litigation.  Gibbons P.C. is one

of the pre-eminent law firms in New Jersey and has extensive experience litigating a variety of class action matters.  The John J. Gibbons Fellowship in Public Interest and Constitutional Law, in particular, has extensive experience litigating matters pursuant to 42 U.S.C. § 1983.  The Seton Hall Law School Center for Social Justice regularly litigates public-interest class action matters.

313.    The Plaintiffs have no interests that are adverse to, or in conflict with, other members of the Class and Sub-Classes.  Plaintiffs and their counsel are committed to vigorously prosecuting this action.  Plaintiffs, through their counsel, have the financial resources to prosecute the case.  Neither Plaintiffs nor their counsel has any interests that may cause them to not vigorously pursue the instant class action lawsuit.

314. **Superiority of Class Action:** A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions as it will conserve the resources of the courts and promote efficient adjudication.  It will allow Class and Sub-Class members to prosecute their common claims and allow Defendant(s) to defend themselves against these claims in front of a single court.  Absent a class action, most Class and Sub-Class members would likely find the cost of litigation prohibitively high; thus, they would have no effective remedy.  The benefits of proceeding with a class action

would substantially outweigh any difficulties that may arise in the management of this case as a class action.

### COUNT I: Procedural Due Process – Municipal Defendants
### (42 U.S.C. § 1983 and Fourteenth Amendment of the U.S. Constitution)

315.    Plaintiffs incorporate and re-allege all of the preceding paragraphs.

316.    Under the United States Constitution, no state shall deprive any person of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV, § 1.

317.    A person may bring a procedural due process claim against a municipality and person acting under color of state law pursuant to 42 U.S.C. § 1983.

318.    Under PPMC § 5.03, the City delegated the power to order a building vacated to a "Public Officer."

319.    At all times relevant to this claim, Defendant Velez was the Public Officer under the PPMC.

320.    As described throughout this Complaint, the City is responsible for Defendant Velez's actions and omissions.

321.    Public Officers are municipal policymakers because, according to the PPMC and/or the authority granted by the City, they can make final decisions regarding properties within the City on the City's behalf.

322.   Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny, the City, through its policymaker, the Public Officer, is liable for harms and losses sustained by Plaintiffs.

323.   In addition, or in the alternative, under *Monell* and its progeny, the City can be held liable for customs and practices of its employees that violate federal constitutional rights.

324.   Here, Defendant Velez did not make an isolated or aberrational decision.  Rather, she closed three buildings over the course of months and, upon information and belief, had plans to close at least one more.

325.   The City has engaged in a similar pattern of illegally condemning buildings on at least eight other occasions from 1999 to 2020, according to the summary judgment motion submitted in connection with Docket No. UNN-L-243-24.

326.   Defendant Velez's actions were taken as part of a larger City policy to use the City's eminent domain powers over the Landlord Defendants' properties.

327.   As such, the City had a policy and/or custom of displacement that violated constitutional rights, which renders it liable under *Monell*.

328.   Under New Jersey law, Plaintiffs and the Class had a property interest in the continued enjoyment and occupancy of their homes.

329.   Plaintiffs and the Class were deprived of these interests when the Municipal Defendants forced them to vacate their homes with, at most, twenty-four hours' notice, and without presenting any information regarding how to be heard about or challenge the deprivation.

330.   To the extent the Municipal Defendants had an interest in ensuring that residential dwellings in the City were fit for human habitation, they could have allowed Plaintiffs and the Class to remain in their homes, while also requiring the Landlord Defendants to remedy the violations of the state and local law.

331.   To the extent the Municipal Defendants were required to order the Buildings closed with only twenty-four hours' notice, the notices they used were legally void and factually insufficient.

332.   Legally, each of the notices has been deemed void *ab initio* and is consequently a legal nullity.

333.   Factually, the notices were inadequate in that they (a) were only in English; (b) failed to apprise Plaintiffs and the Class of the specific basis for the closures; (c) failed to apprise Plaintiffs and the Class of their right to object to and challenge the decision to close the Buildings; (d) failed to comply with the PPMC; and (e) were otherwise defective because the PPMC did not comply with state law.

334.   The Municipal Defendants had the ability to but failed to provide the Plaintiffs and the Class with some form of hearing.

335.   If it is impossible for a government actor to provide pre-deprivation process, it still must provide notice regarding a post-deprivation process.

336.   Here, the City failed to provide any notice of post-deprivation process, including a hearing.

337.   Moreover, Plaintiffs and the Class were falsely led to believe the closures would be temporary and would not amount to a permanent displacement.

338.   The Municipal Defendants' actions in closing the Buildings without due process of law violated Plaintiffs' and the Class members' Fourteenth Amendment due process rights.

339.   The Municipal Defendants' actions were the proximate cause of Class members' injuries.

340.   Plaintiffs and the Class have been grievously harmed financially, emotionally, and psychologically by the sudden deprivation of their homes.

341.   Plaintiffs and the Class are entitled to compensatory damages from the Municipal Defendants, as well as attorney's fees and costs.

342.   Plaintiffs and the Class are also entitled to punitive damages from Defendant Velez in her individual capacity.

### COUNT II: Substantive Due Process – Municipal Defendants
**(42 U.S.C. § 1983 and Fourteenth Amendment of the U.S. Constitution)**

343.   Plaintiffs incorporate and re-allege all of the preceding paragraphs.

344.   Tenants have a protected property interest in their leased homes.

345.   As described above and incorporated in this Count, the Municipal Defendants deprived Plaintiffs and the Class of their homes without any process.

346.   The effect of the Municipal Defendants' actions was to cause families, including pregnant women and young children, to become homeless.  As a result, Plaintiffs and their families slept in cars, on lawns, and in the basements of family and friends after being displaced.

347.   The Municipal Defendants' actions in closing the Buildings shock the conscience.

348.   The Municipal Defendants' actions were the proximate cause of Class members' injuries.

349.   Plaintiffs and the Class have been grievously harmed by the sudden deprivation of their homes.

350.   Plaintiffs and the Class are entitled to compensatory damages from the Municipal Defendants, as well as attorney's fees and costs.

351.   Plaintiffs and the Class are also entitled to punitive damages from Defendant Velez in her individual capacity.

### COUNT III: Procedural Due Process – Municipal Defendants
### (New Jersey Constitution)

352.   Plaintiffs incorporate and re-allege all of the preceding paragraphs.

353.   Article I, paragraph 1 of the New Jersey Constitution provides: "All persons are by nature free and independent, and have certain natural and unalienable

rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

354.  The New Jersey Constitution provides due process protections that are, at times, more expansive than those provided by the federal Constitution.

355.  Accordingly, Plaintiffs and the Class incorporate all allegations set forth in Counts I and II, above but base Count III on a violation of the New Jersey Constitution's due process protections.

## COUNT IV: Breach of the Warranty of Habitability – Landlord Defendants

356.  Plaintiffs incorporate and re-allege all of the preceding paragraphs.

357.  Plaintiffs and members of the Class entered into residential leases with the Landlord Defendants or otherwise were family members or other authorized occupants of the leaseholders.

358.  In New Jersey, there exists an implied warranty of habitability in leases for all the residential units.

359.  The warranty of habitability required the Landlord Defendants to make repairs and otherwise maintain livable conditions in Plaintiffs' dwelling units.

360.  Landlord Defendants failed to provide Plaintiffs and the Class with habitable dwelling units.

361.    The dwelling units occupied by Plaintiffs and the Class and provided by Landlord Defendants were in violation of the applicable housing and building codes.  Further, the dwelling units occupied by Plaintiffs and the Class and provided by Landlord Defendants were not safe and/or sanitary.

362.    The conditions that rendered the dwelling units unsafe and unsanitary had existed since the Landlord Defendants purchased and began managing the Buildings.

363.    The conditions included, but were not limited to, the following non-exhaustive list:

- damaged sewer pipes;

- uncapped sewer pipes that leaked fecal matter;

- inadequate provision of heat and hot water;

- broken toilets;

- defective plumping;

- excessive and hazardous mold;

- damaged and leaking roofs;

- missing and broken carbon monoxide detectors;

- damaged and missed handrails on staircases;

- infestation of rats, mice, and insects;

- damaged and/or broken radiators that deprived units of heat; and/or

- obstructed and/or non-existent fire escapes.

364.   The Landlord Defendants had been on notice of the defects in the dwelling units occupied by Plaintiffs and the Class since the dates on which they purchased the Buildings.

365.   Plaintiffs and other members of the Class informed the Landlord Defendants of these conditions.

366.   The Landlord Defendants took no corrective action or inadequate corrective action to remediate the defects in the Buildings and the dwelling units occupied by Plaintiffs and the Class.

367.   Plaintiffs and the Class paid rent each month to occupy the dwelling units provided by Defendants.

368.   Plaintiffs and the Class are not responsible for the defective conditions and have not waived their right to seek relief based upon those violations.

369.   As a result of the Landlord Defendants' breach of the implied warranty of habitability, Plaintiffs and the Class paid more in rent each month for their apartments than the fair market value of the apartments.

370.   As a result of Defendants' breach of the implied warranty of habitability, Plaintiffs and the Class sustained damages in the form of the difference between the rent paid and the value of the dwelling units in their defective condition.

371.  Plaintiffs and the Class are entitled to compensatory and consequential damages, as well as attorney's fees and costs.

## COUNT V: Violation of the New Jersey Consumer Fraud Act – Landlord Defendants
### (N.J.S.A. 56:8-1, *et seq*.)

372.  Plaintiffs incorporate and re-allege the preceding paragraphs.

373.  Plaintiffs, the Class members, and the Landlord Defendants are considered "persons" within the meaning of N.J.S.A. 56:8-1.

374.  The New Jersey Consumer Fraud Act ("NJCFA") prohibits "any person," including landlords renting rental property, such as the Landlord Defendants, from engaging in "any unconscionable commercial practice. . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid [.]" N.J.S.A. 56:8-2.

375.  The NJCFA applies not just to unconscionable practices in connection with the sale of real estate but also to conduct subsequent to sale or purchase, including the maintenance and upkeep of residential apartment buildings.

376.  At all times relevant herein, Plaintiffs and the Class were consumers of real estate.

377.  At all times relevant herein, and at all times prior to and during the tenancies of Plaintiffs and the other class members, Landlord Defendants expressly and impliedly offered to provide decent, safe and habitable dwelling units and

common areas in return for the rental payments made by plaintiff and the class members.

378.　The Landlord Defendants' failure to make necessary repairs or otherwise maintain the Buildings in safe and habitable condition was a glaring omission of duties imposed upon them by law and contract.

379.　The Landlord Defendants' conduct constitutes an unconscionable and deceptive commercial practice.

380.　Additionally, the Landlord Defendants violated the NJCFA by falsely representing to those members of the Class that moved into the Buildings subsequent to the Landlord Defendants' purchase, whether explicitly or impliedly, that the dwellings were habitable.

381.　As a direct result of Landlord Defendants' unfair and deceptive practices, Plaintiffs and the Class have sustained an ascertainable loss by being charged and paying rent that was more than the value of the dwelling due to the uninhabitable nature of the dwelling.

382.　Additionally, as a direct result of Landlord Defendants' unfair and deceptive practices Plaintiffs have been forced to incur unanticipated expenditures, including, but not limited to, relocation costs; replacement costs for lost or damaged personal property resulting from the removal; and medical and health costs.

383.   Plaintiffs also suffered lost or missed income as a result of the closures, which directly resulted from the uninhabitable conditions of the Buildings.

384.   Plaintiffs and the Class are entitled to treble compensatory, consequential, emotional distress, and punitive damages, as well as attorney's fees and costs.

## COUNT VI: Failure to Return Security Deposit – Landlord Defendants
### (N.J.S.A. 46:8-19, *et seq.*)

385.   Plaintiffs incorporate and re-allege the preceding paragraphs.

386.   Under N.J.S.A. 46:8-21.1, security deposits must be returned within thirty days of the termination of a tenant's lease.

387.   Security deposits must be returned within five days as a result of any failed inspection that is expected to result in displacement for more than seven days.

388.   Plaintiffs and the Class have been displaced from their homes as a direct result of the Landlord Defendants' failure to maintain the Buildings and the apartments therein.

389.   Despite that fact, and despite receiving demands for the return of security deposits, Landlord Defendants have failed to return Plaintiffs' security deposits.

390.   Because Landlord Defendants have failed to return Plaintiffs' security deposits even in the statutorily prescribed thirty days, Plaintiffs are entitled to

recover double the amount of the value of their respective security deposits as well as attorney's fees.

## COUNT VII: Breach of Lease – Landlord Defendants

391.   Plaintiffs incorporate and re-allege the preceding paragraphs.

392.   Pursuant to lease agreements, the Landlord Defendants agreed to provide Plaintiffs and the Class with possession of the apartments that were the subject of the rental agreements.

393.   Plaintiffs and the Class paid rent for the months of their displacement.

394.   After being displaced, Plaintiffs and the Class were deprived of the ability to use, occupy, and peacefully enjoy their homes for which they paid rent for the months of their displacement.

395.   The Landlord Defendants are responsible in full or part for Plaintiffs' and the Class's being deprived of their ability to use, occupy, and peacefully enjoy their homes.

396.   Plaintiffs and the Class are entitled to compensatory damages in the amount of rent paid for the month of their displacement.

## **PRAYER FOR RELIEF**

397.    WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

a. Certify the proposed Class and appoint Plaintiffs as the Class's representatives;

b. Award Plaintiffs and the Class declaratory and injunctive relief, as well as compensatory and consequential damages based on the Municipal Defendants' violation of Plaintiffs' and the Class's due process rights under the United States and New Jersey Constitutions;

c. Award Plaintiffs and the Class declaratory relief as well as compensatory, consequential, and punitive damages based on the Landlord Defendants' violation of the implied warranty of habitability;

d. Award Plaintiffs and the Class declaratory and injunctive relief, as well as compensatory, consequential, treble, and punitive damages based on the Landlord Defendants' violation of the New Jersey Consumer Fraud Act;

e. Award Plaintiffs and the Class declaratory relief, as well as compensatory and statutory damages based on the Landlord Defendants' violation of the New Jersey Security Deposit Act;

f.  Award Plaintiffs and the Class compensatory and consequential damages based on the Landlord Defendants' breach of lease;

g.  Award Plaintiffs and the Class pre- and post-judgment interest;

h.  Award Plaintiffs and the Class reasonable attorney's fees and costs associated with prosecuting this action; and

i.  Award Plaintiffs and the Class any and further relief that the Court deems just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

398.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

[intentionally left blank; signatures on following page]

Date: April 28, 2025
       Newark, NJ

Respectfully submitted,

/s/ Andrew Darcy
Andrew M. Darcy (016852010)[19]
Seton Hall University School of Law
Center for Social Justice
833 McCarter Highway
Newark, NJ 07102
(973) 642-8700
andrew.darcy@shu.edu

Lawrence S. Lustberg (023131983)
Madhulika Murali*
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
973-596-4500
llustberg@gibbonslaw.com

*Attorneys for Plaintiffs and the Class*
*\*Motion for pro hac vice admission*
*forthcoming*

---

[19] Plaintiffs and their counsel would like to thank the following Seton Hall Law School students who provided diligent and thorough research and writing assistance for this Complaint: Gineen Abuali, Mariaeva Batlle, Zachary Benson, Allison Brugger, Clement Dupuy. Lance Fischer, Elena Markos, Rosalena Morrell, Justin Perez, Maura Quinn, and Michael Rowland.